**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

**NOHELIA CASTILLO,**

                    **Plaintiff,**

**v.**

**JOANN URQUHART, M.D., P.C. and**
**JOANN URQUHART,**

                    **Defendants.**

---

**Case No. 8:17-CV-01810-PX**

**DEFENDANTS JOANN URQUHART, M.D., P.C. AND JOANN URQUHART'S**
**MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF EXHIBITS ....................................................................................................ii

I.   INTRODUCTION ..................................................................................................... 1

II.  STATEMENT OF FACTS ........................................................................................ 1

    A. Plaintiff's Background.......................................................................................... 1

    B. Plaintiff's Employment and Duties With the Practice....................................... 2

    C. Plaintiff's Work Schedule .................................................................................. 3

    D. Plaintiff's Termination ....................................................................................... 7

    E. Demand Letter and Lawsuit ............................................................................... 8

III. SUMMARY JUDGMENT STANDARD ................................................................. 9

IV. ANALYSIS................................................................................................................10

    A. Plaintiff is Not Entitled to Overtime Pay As a Matter of Law.........................10

        1. Plaintiff was Exempt from the Overtime Requirements
           of the FLSA and MWHL ........................................................................10

        2. Plaintiff Cannot Demonstrate That She Worked Overtime ......................13

        3. Plaintiff Cannot Demonstrate that Defendants
           Had Knowledge of Overtime Work ..........................................................18

    B. Defendant Paid Plaintiff for Her Accrued and Unused Vacation....................19

    C. Plaintiff Cannot Demonstrate that Defendant Retaliated Against Her ...........20

        1. The Practice's Counterclaim and the Ongoing State Court Lawsuit
           Do Not Constitute An Adverse Action Against Plaintiff. .........................21

        2. Any Statements Made Between Mr. Amster and Dr. Urquhart
           Were Not an Adverse Action and Have Caused No Damages. .................23

        3. Plaintiff, a Former Employee, Cannot Claim Retaliation Under the MWHL. ...........24

V.   CONCLUSION ........................................................................................................25

## TABLE OF EXHIBITS

Exhibit 1.    Excerpts of Nohelia Castillo Deposition Transcript

Exhibit 2.    Nohelia Castillo Resume

Exhibit 3.    Excerpts of Defendant Joann Urquhart's Answers to Plaintiff's First Set of
              Interrogatories

Exhibit 4.    Excerpts of Joann Urquhart Deposition Transcript

Exhibit 5.    Excerpts of Kimberly Baker Deposition Transcript

Exhibit 6.    Excerpts of Wendi Dobson Deposition Transcript

Exhibit 7.    Excerpts of Norma Gonzalez Deposition Transcript

Exhibit 8.    Excerpts of Nohelia Castillo Cellular Phone Records

Exhibit 9.    Affidavit of Wendi Dobson

Exhibit 10.   Emails Discussing Snow Days

Exhibit 11.   Emails Discussing Use of Sick Days

Exhibit 12.   Emails Discussing Use of Vacation Days

Exhibit 13.   Staff Leave Calendar

Exhibit 14.   Excerpts of Virginia White Deposition Transcript

Exhibit 15.   Excerpts of Plaintiff's Responses to Defendants' Requests for Admission

Exhibit 16.   Email from N. Castillo to J. Urquhart re "Meeting"

Exhibit 17.   Letter and Check to N. Castillo

Exhibit 18.   Letter from M. Amster to J. Urquhart re "Nohelia M. Castillo v. Joann Urquhart,
              M.D., P.C. and Dr. Joann Urquhart"

Exhibit 19.    Excerpts of Michael Amster Deposition Transcript

Exhibit 20.   Order of the Circuit Court for Montgomery County Maryland Denying
              Defendant's Motion to Dismiss the First Amended Complaint

Exhibit 21.   Facsimile from "Dr. Urquhart Medical Record" to "Children Hospital Medical
              Record"

Exhibit 22.   Drafts of Letter from "Dr. Joann Urquhart" to "To whom it may concern"

I.      **Introduction**

Dr. Joann Urquhart ("Dr. Urquhart") is a cardiologist who opened her successful Rockville, Maryland solo-practice in 1987. Her small practice employs approximately four full-time employees, two of whom have worked for her for over sixteen years and fourteen years respectively. She hired Plaintiff Nohelia Castillo ("Plaintiff") in 2012 as a Senior Medical Assistant, after having worked with Plaintiff performing cardiology tests at a colleague's office. By May 2017, Plaintiff's job performance had fallen off sharply. Her coworkers noticed that she was "slacking off," and that she acted as if she "did not care anymore" about her job. Dr. Urquhart terminated Plaintiff in May 2017 for poor performance. Plaintiff promptly filed this lawsuit, the next month, alleging that she was entitled to overtime pay. Since her termination, Plaintiff has not looked for another Medical Assistant job in earnest, and instead continues to run the construction business that she founded with her husband while employed by Dr. Urquhart.

As discussed in more detail below, Plaintiff's overtime claims are mere guesses, which do not meet her summary judgment burden. She did not perform any calculable amount of work for which she has not been paid. She has no vacation days for which she has not been compensated. In addition, there is no factual basis to find that Defendants took any adverse action that could be considered retaliation against Plaintiff for asserting her overtime claims. Accordingly, Defendants request that this Court grant summary judgment on all claims asserted by the Plaintiff, as the undisputed facts demonstrate that she is not entitled to relief as a matter of law.

II.     **Statement of Facts**

A.      **Plaintiff's Background**

Dr. Urquhart first met Plaintiff while she was performing nuclear stress tests at the office of one of her cardiologist colleagues, Dr. Shawl, because Dr. Urquhart's office did not, at the time, have the equipment to perform that test. Ex. 1, Castillo Dep. 65:8-20. Plaintiff, a Medical Assistant

("MA") in Dr, Shawl's office, assisted Dr. Urquhart when she used his equipment, but was employed by Dr. Shawl. Ex. 1, Castillo Dep. 61:5-62:4. Plaintiff quit Dr. Shawl's office, without another job lined up, in 2012. Ex. 1, Castillo Dep. 66:15-67:8. She then got a job with another cardiologist's office located in the same building as Dr. Shawl, where she stayed for less than a month before quitting because she "just didn't feel like working there." Ex. 1, Castillo Dep. 77:18-78:20.

**B.      Plaintiff's Employment and Duties With the Practice**

Plaintiff began working for the Practice on August 20, 2012 as a Senior MA. Ex. 2, Resume at 1; Ex. 3, Urquhart's Answers to First Set of Interrogatories at 10. Plaintiff was one of four employees, including a junior Medical Assistant, who at that time was Nazia Khan. Ex. 4, Urquhart Dep. 63:10-15. As Senior MA, Plaintiff's duties included obtaining medication prior authorizations from health insurers, assisting Dr. Urquhart in performing cardiovascular tests (including echo and nuclear stress tests and EKGs), ensuring that patients were prepared to see the doctor by taking their vital statistics and preparing their charts, answering patient questions, processing requests for prescription refills, and ensuring that patients were scheduled at other facilities for necessary tests, including calcium scores. Ex. 1, Castillo Dep. 230:3-242:18; Ex. 3, Urquhart's Responses to First Set of Interrogatories at 14. Plaintiff also completed filing duties, a task that multiple people in the office shared. Ex. 1, Castillo Dep. 242:19–244:15.

Plaintiff's duties as Senior MA involved additional leadership and supervisory duties that the more junior MA did not perform. In addition to performing the duties of an MA, Plaintiff was expected to and did train other MAs in the office and oversee their work. Ex. 1, Castillo Dep. 183:9–16, 192:2–9, 192:14–18, 193:9-19; Ex. 4, Urquhart Dep. 25:6–8, 32:6-15, 33:1-8; Ex. 5, Baker Dep. 8:1-2, 19:20–20:1, 25:3-16. She was also charged with triaging patients to ensure that the most severe cases saw Dr. Urquhart first. Ex. 4, Urquhart Dep. 33:13–34:9. As the Senior MA,

Dr. Urquhart trusted Plaintiff's judgment to ensure that she was seeing the most critical patients before lower priority cases. Ex. 4, Urquhart Dep. 104:11–17. Plaintiff was also expected to recommended additional tests based on her interactions with patients. Ex. 4, Urquhart Dep. 104:11–17. If something in the schedule or the day needed adjusted based on patient needs, it was the Senior MA's job to make that adjustment. *Id*. Plaintiff was also authorized to assist with more complicated tests than the MAs, such as performing the nuclear stress test or stabilizing patients with more severe cardiac issues. Ex. 4, Urquhart Dep. 34:18–35:16, 35:20–37:7. Although not frequently necessary in their small office, Plaintiff was also tasked with disciplining the other MAs. For example, when another MA had a hygiene issue, Plaintiff and another employee, Wendi Dobson, spoke to him about how it was affecting his performance. Ex. 1, Castillo Dep. 196:6–15, 198:4–199:3. Plaintiff was also involved in interviewing new potential MAs, when necessary. Ex. 6, Dobson Dep. 22:13-22:15.

### C.    Plaintiff's Work Schedule

When Dr. Urquhart hired Plaintiff, she informed her that her hours of work would be from 8:00 a.m. to 4:30 p.m., Monday through Friday. Ex. 1, Castillo Dep. 91:4–9, 336:19-22. The Practice classified Plaintiff as a salaried and exempt employee, therefore, it did not keep time records documenting her exact hours of work. Ex. 4, Urquhart Dep. 133:21-134:2. However, everyone in the office, except for Dr. Urquhart, followed this same 8:00 a.m. to 4:30 p.m. schedule. Ex. 4, Urquhart Dep. 17:18-18:17. The vast majority of the time, the entire staff worked these hours. *See, e.g.*, Ex. 5, Baker Dep. 20:8–21:2. Despite this, Plaintiff broadly and without any specificity at all, guesses in her Second Amended Complaint that she "typically worked roughly forty-seven hours per week." Second Am. Comp., Docket Entry ("DE") 35 ¶ 11.

The office was close knit, and the staff (Plaintiff and three other women) usually arrived, together, a bit earlier than 8:00 a.m. in order to beat the traffic (Ex. 1, Castillo Dep. 209:18–22),

eat breakfast together (Ex. 1, Castillo Dep. 211:20–212:10; Ex. 4, Urquhart Dep. 16:11-21), and get parking spots close to the office and close to each other (Ex. 1, Castillo Dep. 210:16–18, 211:3–12).[1] As Plaintiff testified, it was "[a] big office building, but with small parking space. So if you didn't get there, like I said, kind of almost at the same time, it was like somebody will take your spot. . . ." Ex. 1, Castillo Dep. 210:11-15. Indeed, Plaintiff acknowledged that she worked no overtime in the morning:

> Q:   And throughout the course of the day, you've indicated to me that you've worked overtime before work, through lunch, and after work; correct?
> A:   I didn't say before.
> Q:   So you didn't work any overtime before work?
> A:   We came in around that time.

Ex. 1, Castillo Dep. 328:1-328:8.

It is also clear that while Plaintiff may not have chosen to sit down and eat lunch, she was able to, and did, take a break during the middle of the day, including leaving the office to pick up food for herself and the other staff members (Ex. 1, Castillo Dep. 348:12–21) and making phone calls to family members (Ex. 1, Castillo Dep. 515:3-516:9). She went out to buy lunch at least once a week (Ex. 1, Castillo Dep. 347:12-20) and she brought food from home to eat as well, sometimes for the whole staff (Ex. 7, Gonzalez Dep. 36:10–15, 37:4–8). While breaks were not scheduled for a specific time in Dr. Urquhart's office, staff were able to take time for themselves. Ex. 5, Baker Dep. 16:14–15, 17:1–5 (noting that while she did not choose to eat lunch, she regularly took a 20-30 minute break around lunchtime). Particularly because two employees filled the MA role, one was always able to take a break while the other assisted with patients. At the end of the day, the staff liked to wait for everyone to finish working, and would usually all leave the

---

[1] The other members of the staff that worked with Plaintiff for the majority of her time working for Dr. Urquhart were Wendi Dobson, the billing specialist, Virginia White, the administrator, and Kim Baker, an MA that started in the office after Plaintiff. Dobson Dep. 7:7–15; White Dep. 7:5–12; Baker Dep. 7:14–21.

office together. Ex. 4, Urquhart Dep. 18:10–17; Ex. 5, Baker Dep. 27:4–10. They even killed time in the notoriously bad D.C. traffic by calling each other, and checking in on who got home first and who got stuck in the most traffic. Ex. 1, Castillo Dep. 513:22–514:13. Plaintiff called it their "thing." *Id*. On the rare occasions that Dr. Urquhart needed assistance after the office closed, the staff would decide among themselves who would stay later. Ex. 5, Baker Dep. 27:4–28:4; Ex. 6, Dobson Dep. 23:9–13.

Plaintiff is left speculating that she "would say [that she worked] more than eight hours" per day or that most of the overtime she worked was after the office closed at 4:30 p.m. Ex. 1, Castillo Dep. 106:12-21. Plaintiff conjectures that after the office closed, she would stay another hour or more, until around 5:45 p.m., and was "probably" filing paperwork during that time. Ex. 1, Castillo Dep. 337:5–17. She also guesses she could have been making personal phone calls during this time. Ex. 1, Castillo Dep. 335:4–336:5. Plaintiff has offered nothing but unsubstantiated stabs in the dark at whether this work occurred in the first place or how much time it might have occupied, claiming "it all depends on the week. It all depends on the day." Ex. 1, Castillo Dep. 111:13–14.

Although Plaintiff and her coworkers have all reported leaving the office around the same time, the other staff do not report consistently working late hours (Ex. 6, Dobson Dep. 18:21–19:12, 24:10–15; Ex. 5, Baker Dep. 20:8–14), and never report staying late to catch up on paperwork (Ex. 6, Dobson Dep. 19:13–17; Ex. 5, Baker Dep. 20:15–21:2). The Practice uses an answering service so that in the event of a medical emergency, the answering service can page Dr. Urquhart directly. The staff transfers the Practice's phone lines to the answering service promptly at 4:30 p.m., if not before, so that patients are not calling the office after hours. Ex. 1, Castillo Dep. 262:11–16. The staff indicated that they might stay late during patient emergencies, but that these

were rare. *Id*. Usually, Dr. Urquhart's staff scheduled the last appointment of the day no later than 3:30 p.m. Ex. 6, Dobson Dep. 15:12–16. Of course, in a cardiology practice, emergencies can occur at any time. However, Dr. Urquhart ensured that if the staff stayed late on one day, they would leave early on another day to make up for it. Ex. 4, Urquhart Dep. 103:9-16, 131:1–3; Ex. 5, Baker Dep. 34:17–20. The staff also reported alternating who stayed for these types of emergencies, as Dr. Urquhart did not need the entire staff each time. Ex. 5, Baker Dep. 27:16–28:4.

Plaintiff's cellular telephone records support her coworker's testimony about their work hours. Plaintiff frequently took lengthy calls between 4:30 p.m. and 6:00 p.m. — after work ended. *See* Ex. 8. When questioned on these, Plaintiff was unable to determine whether she was still working or was driving home during periods when she made lengthy telephone calls. Ex. 1, Castillo Dep. 334:2-8 (discussing calls from 4:25 p.m. to 5:40 p.m.); *id*. 335:4–12 (discussing a 30 minute call beginning at 5:00 P.M.); *id*. 335:22–336:5 (Q: "Is it possible you were in your car when you made these calls?" A: "Again, probably.").

There were also many times that the staff worked shortened days or weeks. Dr. Urquhart is the only doctor in the practice, so whenever Dr. Urquhart attends a conference or is out of town on vacation, the employees in the office also leave early. Ex. 1, Castillo Dep. 332:8–333:11; Ex. 5, Baker Dep. 34:21–35:4, 36:9–18. If patient appointments end earlier on a particular day, or if Dr. Urquhart has to leave early on a particular day, the staff leaves early as well. Ex. 1, Castillo Dep. 112:10–15. Plaintiff herself admitted that the staff left early when Dr. Urquhart was on vacation: when asked, "So you left early sometimes?" Plaintiff answered, "Yes. When Dr. Urquhart was on vacation too. Yes, absolutely." Ex. 1, Castillo Dep. 332:8-10. Dr. Urquhart was

away either vacation or at a conference on roughly 15-20 days per year. Ex. 4, Urquhart Dep. 19:13-18.

There were also many times that the office was closed entirely. The office observes typical holidays (Ex. 9, Dobson Aff. ¶ 10), and has also closed for snow days (*see, e.g.*, Ex. 10). Of course, Plaintiff also took time off for vacation or for the illnesses of herself or children. *See, e.g.*, Exs. 11, 12. Plaintiff was also late to work on occasion, such as when her children were sick or if traffic was especially bad. *See* Ex. 11; Ex. 1, Castillo Dep. 219:18-220:6. Scheduled office closures, staff vacations, and sick time for each staff member were generally documented on the office calendar, maintained by Wendi Dobson. Ex. 13; Ex. 9, Dobson Aff ¶ 2.

### D.    Plaintiff's Termination

Plaintiff's performance became increasingly unreliable toward the end of her employment. Far from working late, Dr. Urquhart often had difficulty finding Plaintiff when she needed her in the afternoons. Ex. 4, Urquhart Dep. 59:14–20 ("I thought she was doing faxing but often I would have to go find -- I couldn't even find her. …I'd have to go into all the rooms and try to find her and tell her to come back and do clinical work, because we still had patients in the office."); *id.* 130:13–18. Plaintiff's coworkers also noticed that she was "slacking off" and gave off an attitude that communicated "I don't care anymore." Ex. 14, White Dep. 28:7–11. The evidence now makes clear that, especially near the end of her employment, Plaintiff was busy using the Practice's time and resources for personal pursuits, including opening a construction business with her husband (Ex. 1, Castillo Dep. 355:1-3; Ex. 15, Plaintiff's Responses to Requests for Admission No. 12 (admitting Plaintiff was sending faxes from the Practice's office on behalf of Extreme Remodeling)) and studying for an exam for that business to become a licensed home improvement firm (Ex. 1, Castillo Dep. 355:19-356:3); *see also* Ex. 15, Plaintiff's Responses to Requests for Admission No. 7 (admitting she opened or saved at least 735 pages of personal, non-work-related

documents on the Practice's computers). The Practice started losing patients because Plaintiff was not giving her full attention to her work. Ex. 4, Urquhart Dep. 58:21-59:4. Dr. Urquhart was also increasingly concerned the safety of the patients Plaintiff was jeopardizing by leaving them unattended. Ex. 4, Urquhart Dep. 53:11-19; 56:2-57:3. Ultimately, Dr. Urquhart had to terminate Plaintiff because she was not performing her job — the Practice could not operate properly with "one and a half MAs, instead of two." Ex. 4, Urquhart Dep. 67:21. This decision did not shock Plaintiff. About a month before she was terminated, Plaintiff emailed Dr. Urquhart acknowledging her poor performance. Ex. 16, Email from N. Castillo to J. Urquhart ("…I feel I am not meeting your expectations…"). After her coworker told her she was terminated, Plaintiff said "Ms. Virginia, I understand. It's okay." Ex. 14, White Dep. 34:3–6.

After her termination, Dr. Urquhart generously paid Plaintiff for a full week (five days) of vacation, even though she had only two accrued days remaining. Ex. 9, Dobson Aff. ¶ 8; Ex. 13, Staff Leave Calendar; Ex. 17, Letter and Check to N. Castillo (paying 40 hours of vacation pay).

### E.    Demand Letter and Lawsuit

Around June 10 or 11, 2017, Dr. Urquhart received a demand letter from attorney Michael Amster. *See* Ex. 18, Letter from M. Amster; Ex. 4, Urquhart Dep. 110:10–18. The letter prompted Dr. Urquhart to "contact [Mr. Amster] within seven (7) days to discuss" settling her "debt" with the Plaintiff. Ex. 18 at 2. The letter also noted that Dr. Urquhart herself may be personally liable for this "debt," and that "we could attach any judgment we obtain to any property you may personally have. I hope that this will not be necessary." *Id.* Around June 13, 2017, Dr. Urquhart (who was unrepresented at the time) did call Mr. Amster as he demanded, and the two of them had a brief discussion. Ex. 4, Urquhart Dep. 110:10–18, 111:6–9, 132:15–16; Ex. 19, Amster Dep. 58:20-59:1, 80:10–13. This lawsuit was filed on June 30, 2017 (*see* Complaint, DE 1), about two weeks after that phone call and a little over a month after Plaintiff was terminated. This phone call,

along with actions taken within the context of the lawsuit itself, compromise Plaintiff's entire claim for retaliation against Defendants. Second Am. Comp. ¶¶ 50–52, 58–60; Ex. 1, Castillo Dep. 478:9–479:3 ("[S]he hasn't done anything to me.").

## III.     Summary Judgment Standard

Under Rule 56(a), the Court should grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (citation omitted).  Moreover, "[w]hile the evidence of the nonmovant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793, 799 (D. Md. 2001) (*citing Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998)).

A party opposing summary judgment may not rest on mere assertion in the pleadings, but must instead set forth specific facts showing that there is a genuine, material issue which could be resolved at trial. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  While the Court must consider all "reasonable inferences" in favor of the non-moving party, it must also honor "its affirmative obligation to prevent factually unsupported claims and defenses from going to trial." *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 889 (D. Md. 2011). "If the evidence presented by the nonmoving party is merely colorable,

or is not significantly probative, summary judgment must be granted." *Id.* "The nonmoving party ... cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985).

IV.     **Analysis**

    A.     **Plaintiff is Not Entitled to Overtime Pay As a Matter of Law**

The Court should grant summary judgment in favor of the Defendants on Counts I and II of the Second Amended Complaint, which seek time-and-one-half overtime pay for all hours worked in excess of 40 in a workweek. Second Am. Comp., DE 35, ¶ 26–38. As discussed in more detail below, Plaintiff was exempt from overtime pay under the FLSA's "administrative" exemption. Even if Plaintiff is found to be non-exempt, Plaintiff has not offered evidence of a single, specific hour of uncompensated time that she worked, much less proven Defendants' knowledge of the work.

        1.     **Plaintiff was Exempt from the Overtime Requirements of the FLSA and MWHL**

Whether employees are exempt from overtime requirements under the FLSA is a mixed question of law and fact: "[t]he question of how the [employees] spent their working time ... is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 713-14 (1986); *accord Altemus v. Fed. Realty Inv. Trust*, 490 Fed. Appx. 532, 535 (4th Cir. 2012); *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004). The Fourth Circuit regularly affirms the grant of summary judgment where the undisputed facts demonstrate that an employee is exempt. *Altemus*, 490 Fed. Appx. at 537; *Grace v. Family Dollar Stores, Inc.*, 637 F. 3d 508, 518 (4th Cir. 2011); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 338 (4th Cir. 2008); *Jones v. Virginia Oil Co.*, 69 Fed. Appx. 633, 636 (4th Cir. 2003). The requirements under the MWHL

mirror those of the federal law; Plaintiffs' claims under the MWHL therefore "stand[] or fall[] on the success of their claim[s] under the FLSA." *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 242 (D. Md. 2012) (*quoting Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003)).

Here, Plaintiff's undisputed activities demonstrate that she was exempt from the FLSA's overtime requirement as an exempt "administrative" employee. An administrative employee is one:

> (1) who is compensated on a salary or fee basis at a rate of at least $455 per week;
> (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200; Md. Code Regs. 09.12.41.01("Administrative capacity" has the meaning stated in 29 C.F.R. §541.200 *et seq.*"). This test is usually discussed as two-prong: first, courts consider whether a plaintiff meets that "salary basis" component, and second, whether the plaintiff satisfies the last two "duties" elements.

On the first prong, it is clear that Plaintiff was paid a salary. "An employee will be considered to be paid on a 'salary basis' …if the employee regularly receives each pay period … a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602. It is undisputed that Plaintiff's pay did not vary based on the quantity or quality of her work. She admits that she never had her pay docked for being late or leaving early. Ex. 1, Castillo Dep. 220:21–221:2; Plaintiff's Responses to Requests for Admission No. 1. She received the same amount in her paycheck every pay period (subject to periodic raises) without regard to her hours of work. Even had Plaintiff and Dr. Urquhart conceived of her compensation

in terms of an hourly rate, such characterization is not legally determinative; what matters is how Plaintiff was actually paid. *Hugler v. Kazu Constr., LLC*, 262 F. Supp. 3d 1032, 1048 (D. Haw. 2017) ("The labels Defendants used [when they said in a deposition that plaintiffs were hourly employees] are simply not determinative."); *Wright v. Aargo Sec. Services, Inc.*, 2001 WL 91705, at *7 (S.D.N.Y. Feb. 2, 2001) ("The label an employer or a time record furnishes an employee for internal purposes is not determinative of the employee's status under the FLSA. The employer's subjective intent is not the litmus test.").

Plaintiff's job also meets the requirements of the "duties" portion of the test, as Plaintiff's primary duty was patient and personnel management in the office. 29 C.F.R. § 541.201 ("Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as … personnel management [and] human resources…"). Plaintiff's duties are undisputed: When it came to patients, she was charged with patient intake and triage, and high-level clinical tasks. *See supra* Part II.B; *see also* Ex. 4, Urquhart Dep. 33:13–34:9, 34:18–35:16, 35:20–37:7, 104:11–17. With other staff members, Plaintiff was in charge of training, orientation, and the general management of subordinate employees, including the other MA. *See supra* Part II.B; *see also* Ex. 1, Castillo Dep. 183:9–16, 192:2–9, 192:14–18, 193:9-19; Ex. 4, Urquhart Dep. 25:6–8, 32:6-15, 33:1-8; Ex. 5, Baker Dep. 8:1-2, 19:20–20:1, 25:3-16. These duties are clearly non-manual work (i.e., office work). Further, Dr. Urquhart relied on Plaintiff's discretion and independent judgment in performing these tasks. *See* Ex. 4, Urquhart Dep. 104:11–17. Plaintiff, not Dr. Urquhart, helped to orient new employees to the office. *See* Ex. 1, Castillo Dep. 192:2–18. When they had performance issues, Plaintiff monitored those issues and counseled the employee. Ex. 1, Castillo Dep. 196:6–15, 198:4–199:3. With patients, Plaintiff regularly helped to set the schedule and ensure that critical patients were seen before others. Ex. 4, Urquhart Dep. 104:11-

104:17. Plaintiff also fielded and responded to patient questions by phone and e-mail with minimal input from Dr. Urquhart. Ex. 1, Castillo Dep. 230:3-242:18. *See* 29 C.F.R. § 541.201 ("An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management … of the employer's customers.").

### 2.    Plaintiff Cannot Demonstrate That She Worked Overtime

Under the FLSA and MWHL, Plaintiff bears the ultimate burden of proving the existence of, as well as the amount and extent, of uncompensated time that she alleges Defendants "suffered" or "permitted" her to work. Even if Plaintiff were not an exempt employee, she has utterly failed to demonstrate that she worked overtime for which she was not compensated.

Because the Practice classified Plaintiff as an exempt employee, it did not keep records of the hours she spent working. Ex. 4, Urquhart Dep. 133:21-134:2. This lack of documentation, however, does not eliminate Plaintiff's burden of proof on her claims. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) ("[W]e are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The *damage* is therefore certain. The uncertainty lies only in the *amount* of damages….") (emphasis added). Rather than pointing to her employer's time records, Plaintiff is permitted to meet her burden of proof by: (1) establishing that she has in fact performed work for which she was not properly compensated; *and* (2) providing sufficient evidence to show the amount and extent of the work by a matter of "just and reasonable inference." *Lee v. Vance Executive Prot., Inc.*, 7 Fed. Appx. 160, 166 (4th Cir. 2001) (*citing Anderson*, 328 U.S. at 687 (1946)); *see also Carmody v. Kansas City Bd. of Police Com'rs*, 713 F.3d 401, 406 (8th Cir. 2013) (noting that the employee must show both "work performed for which the employee was not compensated, *and* sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference") (emphasis added) (citation omitted). Only *after* Plaintiff has produced actual evidence of both the uncompensated

13

labor and the amount and extent of the work, neither of which she has done here, "the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88.

This burden-shifting framework "do[es] not lessen the standard of proof for showing that a FLSA violation occurred. Rather, "[it] gives a FLSA plaintiff an easier way to show what his or her damages are. ... It would only allow them to prove damages by way of estimate, if they had already established liability." *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 602 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016). Thus, under this system, "[t]he only uncertainty is the *amount* of damage, not the fact that damages are due." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 915 (9th Cir. 2003) (emphasis in original) (quotation omitted), *aff'd*, 546 U.S. 21 (2005).

Here, the undisputed evidence does not demonstrate the fact of uncompensated work. In her Second Amended Complaint, Plaintiff alleges she worked "approximately" or "roughly" forty-seven (47) hours each week. DE 35 ¶¶ 30, 36. Plaintiff has conceded that she never worked before her scheduled shift. *See supra* Part II.C; *see also* Ex. 1, Castillo Dep. 328:1-328:8 ("I didn't say [I worked overtime] before [work]."). The undisputed evidence also demonstrates that she had a *bona fide* meal period.[2] Thus, Plaintiffs' testimony regarding her alleged end-of-day activities is critical to her proving that she worked her alleged forty-seven hours a week. On this, Plaintiff has

---

[2] Plaintiff may claim that she rarely chose to sit down and eat during her mid-day break. *See* Ex. 1, Castillo Dep. 348:19-348:20 (claiming her meal period was compensable because she was "Not having lunch like sitting, when you sit and you eat lunch."). However, whether or not she chose to sit down and actually eat is not the legal standard for determining whether her meal period is compensable. *See Roy v. County of Lexington, S.C.*, 141 F.3d 533, 545 (4th Cir. 1998) ("[W]e believe the most appropriate standard for compensability [of meal periods] is a 'flexible and realistic' one where we determine whether, on balance, employees use mealtime for their own, or for their employer's benefit."). The undisputed record shows that Plaintiff did in fact leave the office at her own initiative, and that with a second MA on staff she was never too busy to be able to do so.

produced only her own speculative, unsubstantiated, and internally contradictory testimony regarding her alleged overtime work and its amount.

When asked for more detail regarding how many hours she worked and when, Plaintiff replied at various times during her deposition that she worked "more than eight hours" "every single day" (Ex. 1, Castillo Dep. 106:19–21), and that she worked "probably about an hour and a half, two hours more" than her scheduled shift, "almost every day" (Ex. 1, Castillo Dep. 107:1–7). However, when presented with contrary evidence, Plaintiff backed off her "estimate," stating instead that "[i]t all depends on the day" (Ex. 1, Castillo Dep. 111:9–14) and that "I cannot assure [you] that it is every single [day]" (Ex. 1, Castillo Dep. 111:2-3). In fact, she concedes that she may have arrived up to an hour late to work on occasion, and alleges she would "try to make up my hours," however Plaintiff lacks any specific memory of instances where this occurred, how long she might have stayed, or how many hours she worked on those days, claiming she "worked, you know, until we were done." Ex. 1, Castillo Dep. 213:17–214:6. When confronted with her own cellular telephone records demonstrating long personal calls during time periods after 4:30 p.m. when she "guessed" she was working, she further admitted that she was "probably" in her car on the way home from work:

> Q: Would you be talking on the phone for a half hour while you're at work?
> A: If we were waiting and we didn't have a patient, probably I could.
> . . .
> Q: So you were in the office when you made these personal calls.
> A: Probably.
> Q: Is it possible you were in your car when you made these calls?
> A: Again, probably.

Ex. 1, Castillo Dep. 335:9–12, 335:22–336:5. When asked what work tasks she was performing during these instances when she made long, personal calls, she supposed that she "was probably

filing. I was probably pulling the charts, faxing. Because we also had to file a lot of paperwork…." Ex. 1, Castillo Dep. 337:14–17.

"[A]n unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference." *Ihegword v. Harris County Hosp. Dist.*, 555 Fed. Appx. 372, 375 (5th Cir. 2014) (citations omitted). While Plaintiff is permitted to estimate her damages, bare speculation and wild guesses will not suffice. *See McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 738 (D. Md. 2005), *aff'd*, 247 F. App'x 430 (4th Cir. 2007); *see also Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (finding that the plaintiff's bare assertion that she worked 210 hours of unpaid time was insufficient to create a dispute of fact without other evidence).

The record in this case is deplete of any corroborating evidence from which the required "just and reasonable inference" may be drawn. As a result, this Court is compelled to grant summary judgment on Plaintiff's overtime claims. *See Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059–60 (8th Cir. 2014) (finding that the plaintiff's vague and bare deposition testimony, where he estimated only that he worked 60 hours every week of his employment, was not sufficient to carry his burden at summary judgment as a matter of just and reasonable inference); *see also Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995) ("It is the duty of the Court to withdraw the case from the jury when [the plaintiff's contention] is so tenuous that it rests merely upon speculation and conjecture.") (citations omitted).

Even if Plaintiff had evidence of some incidents of actually working outside her scheduled shift, such evidence would not be enough to carry her burden. For non-exempt employees, the FLSA prohibits the employment of any person "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified

at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1); *see also* Md. Code Ann., Lab. & Empl. § 3-415. Thus, Plaintiff's burden is not met merely by showing she may have stayed late at work occasionally. She must demonstrate that she worked more than 40 hours across the week—even if she worked in excess of eight hours in a given day—in order to show that she was not properly compensated.

On this, Plaintiff's own testimony fails to account for any holidays, vacation, snow days, or sick days. It does not account for days on which Plaintiff arrived late or left early. It does not account for days that the office had no patients because Dr. Urquhart was on vacation or at a medical conference. It does not account for days which Dr. Urquhart left early, or days when patient appointments ended early. Yet, it is undisputed that Plaintiff did not work her full shift on any such days. Ex. 1, Castillo Dep. 332:8-10 (admitting the staff left early when Dr. Urquhart was on vacation); *id*. 112:10–15. Even had Plaintiff worked late occasionally, as a matter of law, she would not be entitled to overtime pay in any week where she took leave, where the office was closed, or when she arrived late or left early. *See Higgins v. Food Lion, Inc.*, 197 F. Supp. 2d 364, 368 (D. Md. 2002) (noting that two specific instances where the plaintiff might have worked off the clock is "simply too tenuous to survive summary judgment"); *Lee v. Vance Executive Prot., Inc.*, 7 Fed. Appx. 160, 166 (4th Cir. 2001) (affirming summary judgment where the plaintiffs had demonstrated that they had performed work for which they were not compensated by noting instances where they were asked to work after their shifts ended, but that "the record was bereft of evidence showing the amount or extent of this extra work").

The record evidence, taken together, makes clear that Plaintiff asks this court to suppose that she may have worked uncompensated time; she has no evidence (not even her own testimony) to show that she did. *See supra* Part II.C. In fact, her coworkers' testimony makes clear that she

did not. *See* Ex. 5, Baker Dep. 20:8–21:2. Moreover, even if she did work some isolated time outside her scheduled shift, Plaintiff has no idea how much work that would have been. Such bare assertions are not even sufficient to withstand a motion to dismiss (*see* Defendants' Partial Motion to Dismiss, DE 41), and certainly do not carry Plaintiff's burden now at summary judgment.

### 3. Plaintiff Cannot Demonstrate that Defendants Had Knowledge of Overtime Work

Moreover, a "plaintiff[] may not merely estimate off-the-clock hours worked without presenting at least a showing that defendant 'suffered' that work." *Pforr v. Food Lion, Inc*., 851 F.2d 106, 109 (4th Cir. 1988). Even if Plaintiff could meet her burdens to show both that uncompensated work occurred, and the amount and extent of that work, she must also demonstrate that Defendants had knowledge of the time worked, which she cannot. Unlike the burden-shifting framework outlined above, the burden to demonstrate knowledge is squarely on the Plaintiff herself; a defendant is not required to prove lack of knowledge as an affirmative defense. *Id.* "[P]laintiff must show by actual knowledge or by a pattern and/or practice that the employer 'suffered' or allowed the off-the-clock work claimed." *Id*.

Plaintiff has claimed only that during her purported uncompensated post-work time that she was "probably filing," "probably pulling the charts, faxing." Ex. 1, Castillo Dep. 337:11-17. However, it is clear that Dr. Urquhart had no knowledge of this work. Indeed, Dr. Urquhart testified that Plaintiff's failure to be present and perform her duties near the end of the day is the exact reason she was terminated. Ex. 4, Urquhart Dep. 59:14-60:3. Plaintiff's coworkers further testified that the staff usually left together (Ex. 6, Dobson Dep. 18:21–19:12, 24:10–15; Ex. 5, Baker Dep. 20:8–14), and they rarely if ever stayed late to catch up on paperwork (Ex. 6, Dobson Dep. 19:13–17; Ex. 5, Baker Dep. 20:15–21:2).

18

While there may have been isolated instances where the whole office stayed late to address a patient emergency, "[i]t is not enough for a plaintiff to establish [her] employer's knowledge of a few incidents of off-the-clock work, and upon this claim of knowledge, submit a record of [her] three years of alleged off-the-clock work." *Pforr*, 851 F.2d at 109. Here, Plaintiff cannot show that Defendants had any knowledge of the magnitude of hours she claims. Accordingly, her overtime claims must be denied.

**B.      Defendant Paid Plaintiff for Her Accrued and Unused Vacation**

The Court should also grant summary judgment in favor of the Defendants on Count III of the Second Amended Complaint, which seeks pay for seven (7) days of accrued vacation which Plaintiff alleges Defendants failed to pay her when she was terminated. "To establish a claim for unpaid wages under Md. Wage Law a plaintiff is required to prove that, after termination, [s]he was not timely paid for wages due for work [s]he performed." *Higgins*, 197 F. Supp. 2d at 367. As demonstrated above, Plaintiff was not deprived of overtime wages. In addition, as outlined below, Plaintiff was paid in full for her accrued but unused vacation time at the time of her termination.

Employees in the Practice receive 15 vacation days per year beginning on their anniversary date after their first year of employment. Ex. 6, Dobson Dep. 9:22-10:5; Ex. 9, Dobson Aff. ¶ 5. These days are generally not carried over from year to year. Ex. 9, Dobson Aff. ¶ 7. Plaintiff's anniversary date was August 20; her last full day of work was on May 5, 2017. Ex. 3, Urquhart's Responses to First Set of Interrogatories at 10. When she was terminated, Plaintiff had worked just over 8 months of the year, and as such had accrued 10 of her 15 total days of vacation. *See* Ex. 9, Dobson Aff. ¶ 8. Plaintiff requested and received paid vacation time on the following days: August 22-26, 2016 (5 days), December 8, 2016 (1 day), February 13, 2017 (1 day), March 30, 2017 (.5 days), April 26, 2017 (.5 days). Ex. 13 at 22–29.

Accordingly, Plaintiff had used 8 days of her accrued vacation, and only had 2 days of accrued but unused vacation left she was terminated. The Practice generously paid her for 5 days, which is 3 more days of pay than Plaintiff was entitled to. *See* Ex. 17 at 3 (showing 40 hours, or five days, of pay). Hence, Plaintiff was more than fully compensated after her termination, and is not entitled to any additional pay.

### C.    Plaintiff Cannot Demonstrate that Defendant Retaliated Against Her

The Court should further grant summary judgment in favor of the Defendants on Counts IV and V of the Second Amended Complaint, which allege that Defendants retaliated against Plaintiff in violation of both the FLSA and the MWHL. "A plaintiff asserting a prima facie claim of retaliation under the FLSA must show that (1) [s]he engaged in an activity protected by the FLSA; (2) [s]he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008). The record evidence demonstrates that Plaintiff fails to make out the second and third elements of her *prima facie* case. As such, her retaliation claim should be dismissed as a matter of law.

While Plaintiff does not specifically allege any particular activity was an "adverse action," in her Second Amended Complaint, she promulgates two paragraphs that are the only possible allegations to support her retaliation claims: (1) that Defendants filed two counterclaims against Plaintiff, one of which was dismissed without prejudice and refiled in state court (*Id.* ¶¶ 51–52, 59–60); and (2) that Defendants have made a "concerted effort" to "harass and intimidate" Plaintiff by allegedly making certain statements to her counsel (Second Amended Complaint at ¶¶ 50, 58).

To prove an activity was an adverse action, plaintiff must show "that [her] employer retaliated against [her] by engaging in an action 'that would have been materially adverse to a reasonable employee' because the 'employer's actions ... could well dissuade a reasonable worker

from making or supporting a charge of discrimination.'" *Darveau*, 515 F.3d at 343 (*quoting Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). The undisputed facts surrounding these two incidents demonstrate that, as a matter of law, neither of them are adverse.

### 1. The Practice's Counterclaim and the Ongoing State Court Lawsuit Do Not Constitute An Adverse Action Against Plaintiff.

Under the FLSA, a former employee must successfully show that a "lawsuit is filed with a retaliatory motive and lacking a reasonable basis in fact or law" for it to be considered an adverse action. *Darveau*, 515 F.3d at 341 (*citing Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 744 (1983)). "Retaliatory motive and lack of reasonable basis are ***both*** essential prerequisites" to proving that a counterclaim or lawsuit were retaliatory under the law. *Bill Johnson's*, 461 U.S. at 748 (emphasis added); *see also Brach v. Conflict Kinetics Corp.*, 2017 WL 3267961, at *19 (E.D. Va. July 31, 2017) (*citing Darveau*, 515 F.3d at 343).

Here, it is clear that Defendants' state court lawsuit (and, accordingly, the Counterclaim that preceded it) has a reasonable basis in law. Plaintiff moved to dismiss that lawsuit on the merits, claiming that both counts failed to state claims upon which relief can be granted. Her motion to dismiss was denied in full on August 21, 2018. Ex. 20 (denying Ms. Castillo's Motion to Dismiss the First Amended Complaint in its entirety).

Likewise, the Practice's counterclaim is well-grounded in both law and fact. It is well established in Maryland that during the tenure of her employment, an employee has a duty to use all her efforts for the benefit of her employer. *See Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564 (1978). This duty may be called the duty of loyalty, a fiduciary duty, or the fiduciary duty of loyalty. "There is no set rule denoting when an employee has breached his fiduciary duty; rather, a court must examine the facts of each particular case." *Quality Sys., Inc. v. Warman*, 132 F. Supp. 2d 349, 354 (D. Md. 2001). Defendants had at the time of filing, and have now developed

a record, demonstrating that this claim was and is well-grounded in fact. As described above, Plaintiff used the Practice's time and property to "engag[e] in self-dealing through the use of [her] position with [her] employer." Restatement of Employment Law § 8.01(b)(3). She improperly used the Practice's computer for her personal business ventures, including work related to the company she formed with her husband. *See supra* Part II.D; *see also* Ex. 15, Plaintiff's Responses to Requests for Admission No. 12 (admitting she was faxing documents for Extreme Remodeling using the Practice's fax machine). Plaintiff also admits she used her position with the Practice to improperly request her husband's daughter's medical records from Children's Hospital, using the Practice's fax machine, the Practice's letterhead, Dr. Urquhart's name, and without asking permission of Dr. Urquahrt. *See* Ex. 21; Ex. 15, Plaintiff's Responses to Requests for Admission Nos. 13–17. Moreover, Plaintiff used a substantial amount of the time and the resources of the Practice to perform work related to her husband's immigration proceedings. Plaintiff appears to have used the Practice computer to draft, revise, or manipulate at least six versions of a letter purported to have been written by Dr. Urquhart. *See* Ex. 1, Castillo Dep. 438:9–13; *see also* Ex. 22 (demonstrating numerous revisions of the letter). Although specific facts may be in dispute, as a whole the record certainly demonstrates that the Practice's counterclaim was well-grounded in fact and law, and not retaliatory.

Additionally, Plaintiff cannot meet her burden to demonstrate that either the counterclaims or the state court lawsuit were filed with a retaliatory motive. The record reflects that the Practice filed the counterclaims (and later the state court lawsuit) when it did because it believed the claims to be compulsory counterclaims. *See* Fed. R. Civ. P. 13(a)(1)(A), ("A pleading ***must*** state as a counterclaim ***any*** claim that—at the time of its service—the pleader has against an opposing party if the claim ... arises out of the transaction or occurrence that is the subject matter of the opposing

party's claim...." (emphasis added)). The Court did find that one of the Practice's two claims *was* compulsory. *See* Letter Order, DE 16. While the other was found to be permissive, the Practice believed and argued at the time it was filed that it was compulsory. *See, e.g.*, Opposition to Plaintiff's Motion to Dismiss Counterclaims, DE 6, at 4. There is no contrary evidence on the record, nor is there any other evidence demonstrating any retaliatory motive for filing the counterclaims. *See* Ex. 1, Castillo Dep. 478:9–479:3 ("No, she hasn't done anything to me."). Refiling the dismissed counterclaim in the state court was the natural consequence of Plaintiff's own motion to dismiss it on jurisdictional grounds. *See* Plaintiff's Memorandum in Support of Plaintiff's Motion to Dismiss Defendant's Counterclaims, DE 5-1 (arguing to dismiss under Fed. R. Civ. P. 12(b)(1)). For the same reason, any appearance of a casual connection between the filing of the lawsuit and the filing of the counterclaims (the third element of a retaliation claim) is illusory; the counterclaims were filed after the lawsuit because they were compulsory, and the Practice knew that if it did not file them it would lose its opportunity to do so.

### 2. Any Statements Made Between Mr. Amster and Dr. Urquhart Were Not an Adverse Action and Have Caused No Damages.

It is undisputed that Mr. Amster (Plaintiff's counsel at the time) and Dr. Urquhart (when she was an unrepresented individual), had a telephone conversation on or around June 13, 2017. *See supra* Part II.E. The content of that call *is* in dispute. Mr. Amster represents that Dr. Urquhart said she was "going to sue me and my client for libel and slander. She told me that she was going to make sure my client never worked around here again." Ex. 19, Amster Dep. 80:10–13. Dr. Urquhart testifies that she said "Oh, my God. She won't be able to get a job," and does not report making comments about libel or slander, or making any threat to sue either Mr. Amster or Plaintiff. *See* Ex. 4, Urquhart Dep. 132:15–16, 111:6–9. Dr. Urquhart was shocked by receiving the strongly-worded demand letter, and was expressing concern over how a public lawsuit against a

former employer might look to a potential future employer if they searched for Plaintiff's name on the Internet before hiring her. Ex. 4, Urquhart Dep. 132:6–11.

However, even assuming *arguendo* Mr. Amster's version of the facts, such statements do not constitute an adverse action against Plaintiff. The anti-retaliation provisions of employment laws "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67 (discussing retaliation under Title VII). The filing of an FLSA lawsuit does not inoculate Plaintiff from incivility. Accordingly, threats, by themselves (if they even occurred), do not constitute an adverse action. *See Poullard v. McDonald*, 829 F.3d 844, 856—57 (7th Cir. 2016) (recognizing that unfulfilled threats are not materially adverse actions for the purpose of a Title VII retaliation claim); *see also Brach v. Conflict Kinetics Corp.*, No. 1:16-cv-978, 2017 WL 3267962, at *19 (E.D. Va. July 31 2017). (employer's text messages stating that plaintiff would "eat up" legal fees defending countersuits, "warm up your savings for the countersuit," and "your ego is crazy out of control" were not retaliatory). There is no evidence in the record to suggest that Dr. Urquhart acted on these alleged threats. Indeed, Plaintiff herself noted that Dr. Urquhart had done nothing in retaliation for her filing the lawsuit. Ex. 1, Castillo Dep. 478:9–479:3 ("No, she hasn't done anything to me.").

### 3.    Plaintiff, a Former Employee, Cannot Claim Retaliation Under the MWHL.

Finally, the MWHL does not follow the same retaliation framework as the FLSA, and clearly excludes former employees from its coverage. State law prohibits an "adverse action against an employee," and defines adverse action as, "discharge; demotion; threatening the employee with discharge or demotion; and any other retaliatory action *that results in a change to the terms or conditions of employment* that would dissuade a reasonable employee from making a complaint, bringing an action, or testifying in an action under this subtitle." Md. Code Ann., Lab.

& Empl. § 3-428 (emphasis added). An employer cannot change the terms and conditions of employment for a person who does not work for them (i.e., a former employee). Accordingly, Defendants could not retaliate against Plaintiff under Maryland law because she was terminated before she undertook any protected activity.

## V.   <u>Conclusion</u>

For all the foregoing reasons, the Court should enter summary judgment in favor of Defendants and against Plaintiff's Second Amended Complaint in its entirety.

Date: January 18, 2019                                  Respectfully submitted,

                                                        _____/s/_____

                                                        Courtney A. Sullivan (*pro hac vice*)
                                                        J. Douglas Baldridge, Bar No. 11023
                                                        Robin L.S. Burroughs, Bar No. 20507
                                                        Venable LLP
                                                        600 Massachusetts Ave. N.W.
                                                        Washington, D.C. 20001
                                                        202.344.4000 (phone)
                                                        202.344.8300 (facsimile)
                                                        casullivan@Venable.com
                                                        jdbaldridge@Venable.com
                                                        rsburroughs@Venable.com

                                                        *Counsel for Defendants*